IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| TERRY L. SAUNDERS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 7:14-CV-00096 |
| ) | |
| CAROLYN W. COLVIN, ) | |
| **Acting Commissioner of Social Security,** ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION[1]

Plaintiff Terry L. Saunders ("Saunders") challenges the decision of the Commissioner of Social Security ("Commissioner") determining that he was not disabled and therefore not eligible for supplemental security income ("SSI") and disability insurance benefits ("DIB") under the Social Security Act ("Act"). See 42 U.S.C. §§ 401-433, 1381-1383f. Saunders argues that substantial evidence does not support the hearing loss portion of his residual functional capacity ("RFC") assessment. Saunders also alleges that the Administrative Law Judge ("ALJ") did not adequately address the combined effect of his impairments and failed to provide the vocational expert with a hypothetical consistent with his RFC. I agree that the ALJ did not sufficiently explain how he weighed the medical opinions regarding hearing loss. Accordingly, I **GRANT IN PART** Saunders's Motion for Summary Judgment (Dkt. No. 13), **DENY** the Commissioner's Motion for Summary Judgment (Dkt. No. 15), and reverse and remand this case for further administrative proceedings.

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence supports

---
[1] This case is before me by consent of the parties pursuant to 28 U.S.C. § 636(c)(1).

1

the Commissioner's conclusion that Saunders failed to demonstrate that he was disabled under the Act.[2] See Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. See Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Saunders protectively filed for SSI and DIB on February 19, 2010, claiming that his disability began on October 5, 1988.[3] R. 194-99, 200-05. The Commissioner denied his application at the initial and reconsideration levels of administrative review. R. 57-76, 79-101. On July 16, 2012, ALJ Robert S. Habermann held a hearing to consider Saunders's disability claim. R. 32-56. Saunders was represented by an attorney at the hearing, which included testimony from Saunders and vocational expert Leah Perry Salyers. Id.

On November 5, 2012, the ALJ entered his decision analyzing Saunders's claim under the familiar five-step process[4] and denying Saunders's claim for benefits. R. 13-31. The ALJ

---

[2] The Act deems a person disabled for SSI purposes "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. § 1382c(a)(3)(B).

[3] Saunders previously filed an application for disability benefits on January 15, 2008 with an unknown disposition. R. 80. A state agency psychologist noted that Saunders received benefits as a child under former Listing 102.08(B)(1). R. 318. Listing 102.08 covered children with hearing loss. See Technical Correction for Neurological Listing Cross-Reference, 76 Fed. Reg. 16,531 (Mar. 24, 2011) (to be codified at 20 C.F.R. pt. 404).

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform

2

found that Saunders suffered from the severe impairments of borderline intellectual functioning, mixed receptive-expressive language disorder, and hearing loss. R. 18-19. The ALJ determined that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 19-20. The ALJ decided that Saunders retained the RFC to perform a full range of work,[5] with the following nonexertional limitations:

> avoidance of exposure to excessive noise and hazards. He is able to fulfill the basic mental demands of competitive, remunerative, unskilled work including the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.

R. 20. The ALJ determined that Saunders had no past relevant work (R. 25), but that Saunders could work at jobs that exist in significant numbers in the national economy such as a produce sorter, cleaner, and machine monitor. R. 25-26. Thus, the ALJ concluded that he was not disabled. R. 26. On January 7, 2014, the Appeals Council denied Saunders's request for review (R. 1-4), and this appeal followed.

## ANALYSIS

### Hearing Loss

Saunders argues that substantial evidence does not support the hearing loss portion of his RFC because of the cumulative effect of three errors: the little weight assigned to the opinion of

---

other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at the fifth step to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

[5]An RFC is an assessment, based upon all of the relevant evidence, of what a claimant can still do despite his limitations. 20 C.F.R. § 404.1545. Descriptions and observations of a claimant's limitations by him and by others must be considered along with medical records to assist the Commissioner in deciding to what extent an impairment keeps a claimant from performing particular work activities. Id.

3

hearing specialist Geoffrey T. Harter, M.D.; the lack of weight or explanation for the opinions of state agency physicians Donald Williams, M.D. and Joseph Duckwall, M.D.; and the incorrect finding that Saunders's hearing loss is not equivalent in severity to Listing 2.10. For the reasons that follow, I find that the ALJ needs to explain how he weighed the medical opinions regarding hearing loss and thus remand the case for further consideration

*A. Opinion of Consultative Examiner*

Saunders's primary argument on appeal focuses on the ALJ's weighing of consultative examiner Dr. Harter's opinion in determining the RFC. Dr. Harter, who specializes in hearing and audiology, examined Saunders twice on behalf of the Virginia Department of Rehabilitative Services across two applications for benefits, as well as a third time by request of Saunders's counsel. Dr. Harter ultimately gave the opinion that Saunders met Listing 2.10 based on Pure Tone Average ("PTA") scores of 90 dB on the right ear and 88 dB on the left ear (R. 471), and a finding that "[h]e would not be able to work in an environment in which his safety would depend on his ability to hear." R. 465. The ALJ afforded Dr. Harter's opinion little weight because his conclusions were "inconsistent with his own clinical findings (e.g. audiograms with marginal discrimination, the claimant's reports of fluctuating hearing, normal tympanograms, etc.) as well as failing to correlate functionally with other clinical findings in the record." R. 24-25.

When making an RFC assessment, the ALJ must assess every medical opinion received into evidence. See 20 CFR §404.1527(c). Under 20 CFR §§ 404.1527(c)(1) and 404.1527(c)(2), the opinion of a consultative examining source receives greater weight than a non-examining source. Medical specialists who have examined a claimant generally are accorded more weight than a general medical examiner as well. See Taylor v. Colvin, No. 7:13CV00536, 2014 WL 4385796, at *4 (W.D. Va. Sept. 4, 2014). In evaluating the weight to give the opinion of a

4

consulting examiner, the ALJ must consider various factors, including the explanation and support for the opinion, as well as its consistency with the record as a whole. 20 C.F.R. §§ 404.1527(c), 416.927(c). "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." S.S.R. 96–8p, 1996 WL 374184, *7 (July 2, 1996)).[6] The ALJ's decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave" to the opinion and "the reasons for that weight." S.S.R. 96–2p, 1996 WL 374188, at *5 (July 2, 1996)).

Substantial evidence does not support the ALJ's weighing of Dr. Harter's conclusions. Dr. Harter's clinical findings generally appear consistent with his opinion. On March 29, 2007, Dr. Harter diagnosed Saunders with bilateral moderate to profound sensorineural hearing loss, with marginal discrimination of 60% on the right ear and 64% on the left. R. 370. Dr. Harter noted Saunders's inconsistent use of hearing aids and FM auditory training system, and determined that Saunders "clearly is in need of continued amplification." R. 369-70. Saunders's examinations appeared relatively normal. R. 369. Three years later in connection with the application for benefits at issue, Dr. Harter examined Saunders on May 18, 2010 and found that Saunders's hearing loss had worsened to discrimination levels of 80% on the right and 68% on the left. R. 333. His PTA scores were 85 on the right ear and 68 on the left ear. R. 335. Dr. Harter assessed Saunders as having moderate to profound bilateral sensorineural hearing loss and determined that Saunders's hearing loss has "no ability to benefit from amplification." R. 333-34. On July 3, 2012, Dr. Harter met with Saunders and noted his long history of bilateral profound sensorineural hearing loss. R. 468. Saunders reported that "his hearing seems to

---

[6] "Social Security Rulings are interpretations by the Social Security Administration of the Social Security Act. While they do not have the force of law, they are entitled to deference unless they are clearly erroneous or inconsistent with the law." Pass v. Chater, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995) (citing Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989)).

fluctuate" and that he "has difficulty functioning with even his one hearing aid." R. 468. Saunders's typmanogram examination was normal. R. 468. Saunders's PTA scores were 90 in the right ear and 88 in the left ear.[7] Dkt. No. 22-2. Dr. Harter determined that Saunders would receive very little benefit from amplification and that "[a]mplified hearing still brings him up only to a severe loss level with discrimination only 60%." R. 469. Shortly thereafter on July 11, 2012, Dr. Harter gave an opinion that Saunders met Listing 2.10 because "[h]e would not be able to work in an environment in which his safety would depend on his ability to hear." R. 465. On July 20, 2012, Dr. Harter notified the ALJ that Saunders's July 3, 2010 audiogram revealed a PTA score of 90 dB on his right ear and 88 dB on his left ear. R. 471.

The ALJ found Dr. Harter's findings inconsistent because the audiograms showed marginal discrimination, Saunders reported fluctuating hearing, and treatment notes showed normal tympanograms. The ALJ's determinations do not appear to take into account that Saunders's hearing loss is sensorineural in nature. Saunders reported that his hearing began to fluctuate following his last examination with Dr. Harter in May 2010 (R. 468); however, people with sensorineural hearing loss can experience fluctuating hearing. See Jon E. Isaacson et al, Differential Diagnosis and Treatment of Hearing Loss, Am. Fam. Physician (2003), http://www.aafp.org/afp/2003/0915/p1125.html; P.E. Brookhouser et al, Fluctuating and/or Progressive Sensorineural Hearing Loss in Children, Nat'l Center for Biotechnology Info. (1994), http://www.ncbi.nlm.nih.gov/pubmed/8052081. Without further reasoning, it is unclear why the ALJ discounted Dr. Harter's conclusions because of Saunders's reports of fluctuating hearing.

---

[7] Saunders moved the court to consider the additional evidence of a July 2012 medical record from Dr. Harter. Dkt. No. 22. Without objection from the Commissioner and finding good cause to do so, the court grants the motion for leave to file additional evidence and incorporates it into the record.

6

Similarly, the ALJ's reliance on Saunders's tympanograms examinations is unclear. Saunders has been diagnosed with sensorineural hearing loss, which is caused by damage to the inner ear or the nerve pathways from the inner ear to the brain. See Sensorineural Hearing Loss, Am. Speech-Language Hearing Ass'n, http://www.asha.org/public/hearing/sensorineural-hearing-loss/ (last visited September 1, 2015). "Tympanometry measures the impedance of the middle ear to sound…. [and] is useful in identifying middle-ear effusions…." Hearing Loss, Colum. U. Dep't of Otolaryngology, http://www.entcolumbia.org/hearloss.html (last visited September 1, 2015); see also Briggs v. Shinseki, No. 12-1603, 2013 WL 4478894, at *5 n.10 (Vet. App. Aug. 21, 2013). Tympanometry does not test hearing sensitivity, but tests the movement of the eardrum based on air pressure in the canal–frequently to reveal fluid in the ear or blockages. See Diagnostic Evaluation, U. Tex., http://www.utdallas.edu/~thib/rehabinfo/de.htm (last visited Sept. 1, 2015); see also Johnson v. Colvin, No. 3:13-CV-877 DCB MTP, 2014 WL 4639772, at *3 n.10 (S.D. Miss. Sept. 16, 2014) (noting the test's effectiveness in reviewing the condition of the middle ear and use in distinguishing between sensorineural and conductive hearing loss). Rather than tympanograms, bone conduction tests normally are employed to assess problems in the inner ear. See Hearing Loss, Colum. U. Dep't of Otolaryngology. As Saunders's hearing loss is related to problems with his inner ear, it is unclear why the ALJ relied on the examination of Saunders's presumably unaffected middle ear to discount Dr. Harter's opinion. The ALJ may have a reasonable explanation, but his limited discussion does not allow the court to review his reasoning.

The ALJ's consideration of Saunders's speech discrimination scores is more reasonable, but still raises questions. Dr. Harter's notes about speech discrimination are not as clear as desired; he described "marginal discrimination" of 60% on Saunders's right ear and 64% on the

7

left in 2007, and then wrote that Saunders's amplified hearing has a "severe loss level with discrimination only 60%." R. 469. Comparing these scores against a general guideline for speech discrimination, Saunders's scores fell on the border of fair hearing (moderate difficulty most of the time) to poor (difficulty in following conversation). See David A. Morton, III, M.D., Social Security Disability Medical Tests § 2.28 (James Publishing 2013). Given Dr. Harter's unclear interpretations of the speech discrimination scores, as well as their comparison to general standards, the ALJ reasonably could have found that Saunders's speech discrimination scores did not support Dr. Harter's conclusions about disability. However, it is unclear whether the ALJ considered Saunders's PTA scores. The ALJ did not mention Saunders's PTA scores from his appointments with Dr. Harter, and only briefly mentioned "a pure fail average of 90 decibels in the right ear and 88 decibels in the left ear" based on Dr. Harter's July 10, 2012 medical source statement. R. 22. The ALJ did not mention these scores in his evaluation of Dr. Harter's opinion and it is unclear why considering their severity. Given that Saunders's hearing loss as measured by Dr. Harter may have been within decibels of meeting Listing 2.10(A), the ALJ needs to explain how the PTA scores factored into his assessment of Dr. Harter's conclusions.

Dr. Harter's findings also generally align with the remaining observations and clinical findings in the record. From September 2001 through November 2002, audiologists Carrie Duncan Miller, M.S. and G. Wayne Moore, M.S. saw Saunders five times and diagnosed him with bilateral mild sloping to moderately severe sensorineural hearing loss. R. 267-68, 423-32. Their treatment notes discuss how Saunders's hearing had changed considerably over the years, how Saunders needed to wear his hearing aids at all times, and how he had difficulty hearing and focusing without consistent use of both aids. R. 423-24, 432. Saunders's speech reception thresholds were found to be 40dB aided and 65dB unaided in September 2001 (R. 427); 35dB to

8

75dB aided and 65dB to 105dB unaided in November 2005 (R. 432); and 25dB to 75dB aided and from 65dB to 105 dB unaided one week later in November 2005. R. 267-68. Although the audiologists' findings may not have been as severe as Dr. Harter's conclusions, they examined Saunders's years prior to this application and still show a greater level of hearing loss than reflected in the ALJ's consideration of Dr. Harter's opinion or in the RFC.

Saunders's school and vocational records show consistent academic challenges caused by hearing loss that lend further credibility to Dr. Harter's conclusions. Saunders's Individualized Education Plan ("IEP") from Patrick Henry High School noted Saunders's need for a slower pace, repetition, and clarifications due to hearing loss. R. 270. The IEP also noted difficulty following multistep, complex directions. R. 272. Saunders's teachers used a Phonic Ear, which made a great difference in his ability to interact in the classroom. R. 287. During Saunders's vocational evaluation in the ninth grade, the evaluator discussed Saunders's "difficulty using the telephone without a volume control" and gave the opinion that he "could utilize a job coach during the initial learning stages of a job, since the manager or supervisor may not want to take the time to directly supervise him and provide direct instruction by utilizing a sound amplification device." R. 284-85. The ALJ did not specifically discuss Saunders's history of hearing loss challenges in the school system and need for assistance in addition to hearing aids.

The other physical medical opinions in the administrative record, none of which included an examination of Saunders, did not include as severe of findings as Dr. Harter but generally suggested more hearing restrictions than represented in the RFC. On June 22, 2010, state agency physician Richard Surrusco, M.D. reviewed Saunders's record and determined that he faced "[l]imited to occasional" communicative limitations due to hearing in both ears but did not set any environmental limitations. R. 74-75. In a September 7, 2010 record review, state agency

9

physician Donald Williams, M.D. determined Saunders had limited communicative limitation due to [b]ilateral sensorineural hearing loss; he noted "[s]peech discrim. 80% Rt and 68% on Lt." R. 63. Dr. Williams recommended avoiding even moderate exposure to noise. R. 64. On February 14, 2011, state agency physician Joseph Duckwall M.D. also found that Saunders faced limited to occasional communicative limitations due to hearing in both of his ears and recommended avoiding even moderate exposure to noise.[8] R. 86-87. Two of the three state agency physicians' recommended noise limitations exceeding the ALJ's selected RFC and lend at least some support to Dr. Harter's opinion.

Saunders's self-reports align with Dr. Harter's conclusions as well. In his function report, Saunders explained that his hearing loss required people to speak louder, repetitively, and directly to him. R. 234. Moreover, while applying for disability, the Commissioner's field office disability report noted Saunders "was having a hard time hearing and understanding what i [sic] was saying…. He was also hard to understand due to his speech impediment. He asked to have his mother answer the questions because he could not understand what I was asking." R. 218. Saunders noted that he had been unable to wear hearing aids for two years because he lacked insurance and could not afford hearings aids or a doctor's appointment. R. 236.

In sum, the ALJ ultimately did not provide sufficient explanation for the court to review his decision to give little weight to Dr. Harter's opinion. Dr. Harter's clinical findings do not appear inconsistent with the symptoms of sensorineural hearing loss and Saunders's hearing

---

[8] The ALJ incorrectly stated that Dr. Williams originally reviewed the medical evidence and then Michael Hartman, M.D., Dr. Surrusco, and Dr. Duckwall re-reviewed it upon reconsideration. R. 22. The ALJ mistakenly reviewed the state agency physicians' reports from an application Saunders protectively filed on January 15, 2008. R. 80. Dr. Williams reviewed the records in June 2008 (R. 382-87) and Dr. Hartman reviewed them on reconsideration in October 2008. R. 405. The only medical opinions from this application were from Drs. Surrusco in June 2010 (R. 74-75), Williams in September 2010 (R. 63-64), and Duckwall in February 2011(R. 86-87). Notably, Dr. Williams's opinion changed from recommending avoiding concentrated noise exposure in June 2008 to avoiding even moderate noise exposure in September 2010. Compare R. 385, with R. 64. This recommendation is consistent with Dr. Harter's note of worsened hearing loss. Even in 2008 with better hearing, Dr. Williams determined that "[h]earing aids will only moderately assist with hearing certain sounds and frequencies." R. 387.

10

examinations; the ALJ may be correct in finding them inconsistent, but he needs to provide additional explanation to support this determination. The rest of the administrative record generally supports Dr. Harter's conclusions that Saunders faces hearing loss limitations more restrictive than "avoidance of exposure to excessive noise" and broader than only safety-related restrictions (rather than general communicative restrictions).[9] The ALJ needs to provide more information about why Dr. Harter's findings do not correlate functionally with the record because it is not obviously so in the court's review. Saunders's claim shall be remanded to allow the ALJ to explain his weight for Dr. Harter's opinion.

*B. Opinions of State Agency Physicians*

Saunders similarly contests the ALJ's treatment of opinions by state agency physicians Dr. Williams and Dr. Duckwall. The physicians both performed record reviews of Saunders's bilateral sensorineural hearing loss, finding that he had the RFC to perform all work with noise limitations. R. 385, 100. Both Dr. Williams and Dr. Duckwall determined that Saunders had speech discrimination of 80% on the right ear and 68% on the left and recommended avoiding even moderate exposure to noise. R. 63-64, 99-100. In weighing the medical opinions, the ALJ "accord[ed] great weight to the clinical findings and assessments of Dr. Luckett, Dr. Bennett, the State agency medical consultants, and State agency psychological consultants, Dr. Perrott and Dr. Leizer as their opinions are consistent with the evidence of record as a whole in describing the claimant's long-term conditions, treatment history, and limitations." R. 24. The Commissioner contends that the ALJ provided great weight to Drs. Williams's and Duckwall's

---

[9] The court recognizes the vocational expert recommended positions that "per se do not involve ongoing communications, verbal communication with coworkers on an ongoing steady level in order to complete the actual job tasks." R. 55. However, given that the ALJ did not ask a hypothetical with a more restrictive hearing loss limitation, it is unclear whether these positions would remain available if Dr. Harter's opinion is taken into consideration. The court also acknowledges that the ALJ advised the vocational expert to accept Dr. Harter's report as accurate (R. 48); however, the ALJ subsequently restricted Dr. Harter's opinion to only safety-related noise concerns after the vocational expert could not find any jobs under the hypothetical. R. 50-51.

11

opinions when he referenced the "State agency medical consultants." Dkt. No. 16, p. 18. Saunders contends that the opinions were not weighed within that statement.

The Fourth Circuit requires ALJs to "explicitly indicate the weight given to relevant evidence." Hines v. Bowen, 872 F.2d 56, 59 (4th Cir.1989). The ALJ's description of the physicians in his weighing of medical opinions was not abundantly clear and could have benefited from directly stating the physicians' names. However, the only doctors not mentioned by name are Drs. Williams, Duckwall, and Surrusco–who are state agency medical consultants. Given that that Drs. Williams and Duckwall are state agency medical consultants, and the fact that the ALJ referred to both as "medical consultants" earlier in his opinion (R. 22), the court finds that the ALJ did weigh their opinions and gave them great weight. To the extent that Saunders challenges the ALJ's choice not to incorporate Drs. Williams's and Duckwall's recommended limitation of avoiding even moderate exposure to noise, the court cannot infer from the ALJ's minimal discussion why he ignored their noise exposure recommendations or limited their restriction to only safety-related considerations. The ALJ can provide further explanation on remand.

*C. Listing 2.10*

Saunders contends his hearing loss meets or equals the requirements of Listing 2.10. A "listed impairment" is one considered by the Social Security Administration "to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). "When satisfied, the listings of impairments automatically result in a finding of disability. The listings are designed to reflect impairments that, for the most part, 'are permanent or expected to result in death.'" Casillas v. Astrue, 3:09-CV-00076, 2011 WL 450426, at *4 (W.D. Va. Feb. 3, 2011) (citing 20 C.F.R. §

404.1525(c)(4)). It is well settled that Saunders must establish that he meets all of the requirements of a listing. See Sullivan v. Zebley, 493 U.S. 521, 530 (1990).

Listing 2.10, for hearing loss not treated with cochlear implantation, requires proof of the following:

> A. An average air conduction hearing threshold of 90 decibels or greater in the better ear and an average bone conduction hearing threshold of 60 decibels or greater in the better ear (see 2.00B2c).
>
> OR
>
> B. A word recognition score of 40 percent or less in the better ear determined using a standardized list of phonetically balanced monosyllabic words (see 2.00B2e).

20 C.F.R. Pt. 404, Subpt. P., App'x 1, § 2.10. The Commissioner generally requires both an otologic examination and audiometric testing to establish proof of hearing loss. See 20 C.F.R. Pt. 404, Subpt. P., App'x 1, § 2.00(B). This testing information will be reviewed alongside "other relevant information… about your hearing, including information from outside of the test setting." Id.

Saunders contends that he meets these requirements, and at a minimum, medically equals the requirements in Listing 2.10. Dr. Harter gave the opinion that Saunders's hearing loss meets the requirements of Listing 2.10(A) for an average air conduction hearing threshold, but not Listing 2.10(B) for word recognition score. R. 471. Dr. Harter supported his recommendation with a July 3, 2012 audiogram showing an average threshold of 90 decibels in Saunders's right ear and 88 decibels in his left ear.[10] R. 471. Although Saunders relies on Dr. Harter's assertion

---

[10] The Pure Tone Average ("PTA") test is an air conduction hearing test. See Pure-Tone Testing, American Speech-Language Hearing Association, http://www.asha.org/public/hearing/Pure-Tone-Testing/ (last visited Sept. 1, 2015). The parties were unaware whether this test was the same as the referenced examination in the regulations. Listing 2.10(A) internally references § 2.00(B)(2)(c): "To determine whether your hearing loss meets the air and bone conduction criteria in 2.10A, we will average your air and bone conduction hearing thresholds at 500, 1000, and 2000 Hertz (Hz). If you do not have a response at a particular frequency, we will use a threshold of 5 decibels

13

that he met Listing 2.10(A), it appears that Dr. Harter may have misunderstood the requirements of the listing. As the ALJ noted in his opinion, Listing 2.10(A) "requires an average air conduction hearing threshold of 90 decibels or greater <u>in the better ear</u>. Dr. Harter's opinion relied on an audiogram revealing 88 decibels in the better ear." R. 25. Saunders points to no other evidence in the record that supports meeting the requirements of Listing 2.10(A).

In the alternative, Saunders argues that the severity of his hearing loss medically equals Listing 2.10(A). It is the claimant's burden to show how his hearing loss medically equals the listing criteria. <u>See</u> <u>Escobar v. Colvin</u>, No. CIV.A. 13-10186-JGD, 2014 WL 1159822, at *14 (D. Mass. Mar. 20, 2014). The ALJ wrote very little about Saunders's ability to medically equal the listing, stating that Saunders did not meet the average hearing thresholds or word recognition scores required by the listing, and inexplicably citing the opinion of licensed clinical psychologist Gary Bennett, Ph.D. as evidence that "the claimant's impairments did not meet or equal a listing." R. 19; <u>see also</u> R. 419 (stating in his expert opinion that "the biggest challenge Mr. Saunders seem to be facing appears related to his hearing loss issues. I am not in a position to comment on the severity of that condition or possible limitations created by it."). The court cannot review whether substantial evidence supports the ALJ's decision about whether Saunders equals Listing 2.10 without further explanation of the medical opinions regarding hearing loss. Thus, ALJ is advised to provide a clearer explanation as to why Saunders's hearing loss does not medically equal Listing 2.10(A) upon remand.

### Combination of Impairments

Saunders also alleges disability due to a combination of impairments. Saunders asserts that the ALJ failed to evaluate the combined effect of the logically connected impairments of

---

(dB) over the limit of the audiometer. It is unclear whether Dr. Harter's PTA test meets the testing requirements of Listing 2.10; the ALJ should address the applicability of Dr. Harter's test to the listing requirements on remand.

Case 7:14-cv-00096-RSB  Document 23  Filed 09/25/15  Page 14 of 19  Pageid#: 578

hearing loss and language/mental functioning. Dkt. No. 14, p. 12-13. At the hearing before the court, Saunders specifically targeted the ALJ's choice not to incorporate the restriction of needing a job coach into the RFC.

It is well settled that the ALJ must consider the combined effect of a claimant's impairments when determining a claimant's ability to work, and "adequately explain his or her evaluation of the combined effects of the impairments." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989) (citing Reichenbach v. Heckler, 808 F.2d 309, 312 (4th Cir.1985)). "It is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render [the] claimant unable to engage in substantial gainful activity . . . . [T]he [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them." Id. at 50.

The ALJ stated that he considered the combination of Saunders's impairments in the reduced RFC. R. 25. The court cannot review whether substantial evidence supports his decision about the combination of impairments without further explanation of the weights assigned to medical opinions regarding hearing loss. However, the ALJ's review of Saunders's mental impairments shall be briefly addressed in order to provide further guidance on remand. The ALJ discussed Saunders's sub-average intellectual abilities by reviewing medical opinions and evaluations, his receipt of special education services, and his moderate difficulties in maintaining concentration, persistence, or pace. R. 19-24. The ALJ noted Dr. Luckett's report that "once having grasped the nature of tasks, [Saunders] would not need specialized supervision," but otherwise did not mention opinions about supervision. R. 23.

Three medical opinions, all of which were given great weight, reviewed the need for extra supervision or a job coach. Joseph Leizer Ph.D. determined Saunders "need[ed] special

15

supervisory help to at least initially learn new job duties" in his October 22, 2008 record review.

R. 408. Jeffrey Luckett, Ph.D. consultatively examined Saunders on August 24, 2010 and found,

> [a]lthough not a prerequisite for his returning to work, a referral to the Department of Rehabilitative Services for testing and the use of a job coach could help this individual to not only gain but maintain his employment. Potential employers would need to be understanding of his receptive and expressive language difficulties and work with him. He would probably not do well working directly with the public due to these difficulties but would be able to work with peers and supervisors appropriately and, once having grasped the nature of the task, would not need specialized supervision.

R. 415. In a February 25, 2012 letter, Gary T. Bennett, Ph.D. reviewed Saunders's records and noted how Saunders's vocational evaluated found he "needed close supervision due to not recognizing the logical next step in very basic food preparation." R. 418.

The administrative record is replete with evidence of substantial mental challenges that could support at least an initial need for a job coach. Vocational evaluations recorded a slow work pace (R. 346, 351) and included the recommendation of employing a job coach during the early stages of a job. R. 284-85, 351. Medical opinions regularly found moderate limitations in concentration, persistence, or pace (R. 316, 330, 419-21) and moderate to marked limitations in understanding, remembering, and carrying out detailed instructions. R. 316, 406-08, 420-21. Repeated examinations showed IQ scores falling in the borderline range of intellectual abilities to the mental deficient range of intellectual abilities. R. 337-38, 378-79, 409-15, 445. Saunders received special education services (R. 261-83) and his school records noted communication challenges and difficulties understanding instructions. R. 270-72. Saunders's self-reports support his claimed mental challenges, where he stated he can be easily distracted, required reminders, and often needed instructions to be repeated several times or written. R. 234.

16

Case 7:14-cv-00096-RSB   Document 23   Filed 09/25/15   Page 16 of 19   Pageid#: 580

The court cannot evaluate whether substantial evidence supports the RFC without further explanation for the hearing loss opinions; however, the ALJ's decision does not explain why Saunders does not require at least an initial job coach or how the RFC accounts for his moderate difficulties in maintaining concentration, persistence, or pace. See generally Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015). Given Saunders's interconnected challenges of hearing loss and intellectual deficiencies, the ALJ shall provide further explanation on remand as to why he did not accept the medical recommendations of temporarily requiring a job coach or why such a recommendation does not need to be included in the RFC.

### Hypothetical to Vocational Expert

Saunders argues that the ALJ's hypothetical and the vocational expert's response were vague. Dkt. No. 14, p. 14-15. Saunders also raises the concern that the hypothetical required the vocational expert to "make an unspoken determination as to how the information in the record translated into a proper residual functional capacity assessment before then deciding what occupations might be available." Dkt. No. 14, p. 14. The ALJ provided several preliminary questions to the vocational expert at the beginning of the hearing, but asked the following hypothetical after receiving evidence:

> I want you to assume we have a 23-year old individual with a 12th grade education. And I want to assume that a lot of was in special ed. I want you to assume that he can read and write at least to sixth grade level, at least to sixth. It could be higher than that, but at least the sixth-grade level. I want you to assume from a physical standpoint he has no significant problems other than hearing…. From a psychological standpoint I want you to assume that the reports of Dr. Bennett and found in 15F is accurate and up to date. From a hearing standpoint I want you to assume that what Dr. Harter said in the report and you read is accurate an up to date…. Would there be any jobs an individual so defined could perform under this hypothetical? ... I also want you to also take very seriously the restrictions on his hearing, okay, that were stated, not necessarily the check mark, okay?

17

R. 48-49. The vocational expert initially stated that she was "unable to come up with any possibilities that fit both types of–both criteria." R. 49. The ALJ clarified that "the physician doesn't talk about noise. He's talking here essentially about safety." R. 50. After stating "I understand how you're clarifying this," the vocational expert gave the opinion that "the heavy classification should not be considered" but that Saunders could perform the medium position of produce sorter, light positions of office cleaner and hotel cleaner, and sedentary position of machine monitor. R. 51-52.

The purpose of a vocational expert is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). A vocational expert's opinion must be given in response to proper hypothetical questions, which fairly set out all of the claimant's impairments. See Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005) (quoting Walker, 889 F.2d at 50). The ALJ has "some discretion to craft hypothetical questions to communicate to the vocational expert what the claimant can and cannot do." Fisher v. Barnhart, 181 F. App'x 359, 364 (4th Cir. 2006). Hypothetical questions should adequately reflect the plaintiff's RFC as found by the ALJ and supported by sufficient evidence. Id.

The ALJ's choice to refer to medical opinions in a hypothetical and provide those opinions to the vocational expert does not constitute error. See, e.g., Jones v. Colvin, No. 7:14CV00273, 2015 WL 5056784, at *3 (W.D. Va. Aug. 20, 2015) (affirming where ALJ asked expert to consider all limitations from medical opinion). The issue is whether the ALJ's hypothetical about Dr. Harter's opinion–and particularly his clarification regarding safety-related noise exposure–clearly set out the limitations for the vocational expert's response. See Fisher, 181 F. App'x at 364. The transcript of the hearing before the ALJ suggests that the vocational

18

expert ultimately understood the ALJ's clarified hypothetical and responded accordingly. R. 50. Given that this case will be remanded regardless, the ALJ can take under consideration whether to include specific restrictions in the hypothetical to avoid potentially varying interpretations of the medical opinions.

## CONCLUSION

For the foregoing reasons, Saunders's motion for summary judgment is **GRANTED IN PART** and the Commissioner's motion for summary judgment is **DENIED**, and this case is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this opinion.

Enter: September 25, 2015

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge